## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **AINSTEIN AI, INC.,** ) | |
| ) | |
| ) | Case No: |
| Plaintiff, ) | |
| ) | JURY TRIAL DEMANDED |
| v. ) | |
| ) | |
| **ADAC PLASTICS, INC.** ) | |
| ) | |
| ) | |
| Defendants. ) | |

## VERIFIED COMPLAINT

Plaintiff Ainstein AI, Inc. (individually as to all Counts, and alternatively as to Count IV derivatively on behalf of RADAC, LLC) ("Plaintiff" or "Ainstein"), for its causes of action against Defendant ADAC Plastics, Inc. ("Defendant" or "ADAC"), states as follows:

## PARTIES

1.      Plaintiff Ainstein is a Delaware corporation with its principal place of business located at 1421 Research Park Drive, Suite 2A, Lawrence, Kansas 66049.

2.      Defendant ADAC is a Michigan corporation with its principal place of business located at 5690 Eagle Drive South East, Grand Rapids, Michigan 49512. Defendant manufactures and sells automobile products internationally.

## JURISDICTION AND VENUE

3.      Defendant is subject to this Court's jurisdiction and general personal jurisdiction in Kansas because the Defendant has breached a contract with and misappropriated trade secrets from Plaintiff, a citizen and resident of Kansas, causing harm to Plaintiff in Kansas.  Defendant also entered into several contracts with Plaintiff that were to be performed in part in Kansas.

CORE/3502457.0004/181160073.3

4.     Subject matter jurisdiction exists under 28 U.S.C. § 1332 because this action is between citizens of different states and seeks relief valued at over $75,000.  Subject matter jurisdiction also exists under 28 U.S.C. § 1331 because this action seeks relief under the federal Defend Trade Secrets Act, 18 U.S.C. § 1836.

5.     Venue is proper in this District under 28 U.S.C. § 1391(b) and (c) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District and because Defendant is subject to personal jurisdiction in this District.

## FACTS

### Ainstein Develops and Commercializes Radar Technology

6.     Dr. Zongbo Wang is a Ph.D. in electrical engineering, and is originally from China. In 2013, he moved to Lawrence, Kansas and began working as a professor at the University of Kansas ("KU") researching radar systems development in ice sheets, sounding, and imaging applications.

7.     Radar is widely used in modern technology to detect the presence, direction, distance, and speed of objects using high-frequency radio waves. Radar is not affected by natural conditions, such as snow, rain, fog, and dust, making it the most reliable detection technology for automotive, aerial, and industrial applications.

8.     In 2015, Dr. Wang founded Ainstein, a business focusing on the development and commercialization of radar technology applications for manufacturing and industrial use.

9.     As a professor at KU, Dr. Wang draws talent from KU alumni and students to staff Ainstein. Ainstein's team of over 80 employees helps to develop radar sensing solutions to be used in drones, helicopters, commercial trucks and other vehicles, tracking devices, traffic lights, and even sports equipment, including golf clubs.

CORE/3502457.0004/181160073.3

10.     Ainstein's millimeter wave patent-protected radar technology uses active scanning sensors, which assist in product awareness and automation. Ainstein has over 30 pending or approved patents in radar architecture, signal processing, and antenna design.

**Ainstein Enters into a Joint Venture with ADAC to Form RADAC, LLC**

11.     ADAC is a Michigan-based company that supplies mechatronic vehicle access systems to some of the largest automotive brands in the world.

12.     In July of 2019, Ainstein and ADAC entered into a Non-Disclosure Agreement and commenced discussions about working together to design, develop, and manufacture innovative radar-based sensing solutions for use in the international automotive marketplace.

13.     In July of 2020, ADAC retained Ainstein as a contractor to develop a proximity sensor utilizing radar for use in rear access automotive applications.  This contract work lasted approximately one year.

14.     ADAC expressed to Ainstein that it was pleased with Ainstein's work and technical knowledge, and proposed pursuing further collaborative development of radar-assisted applications for vehicles through a joint venture.

15.     The parties discussed focusing their partnership on radar-based sensing solutions for use in applications including proximity gesture access sensor technology, parking assistance technology, object detection and advanced driver assistance software.

16.     On information and belief, ADAC was interested in creating a partnership with Ainstein because it knew that with Ainstein's cutting-edge radar technology, it could significantly advance its product development efforts within a short time, leading to favorable profit margins.

17.     In connection with exploring the potential joint venture, in or about October, 2020, ADAC retained a business advisory firm that provides independent valuation services to determine the fair market value of Ainstein's proposed intellectual property contributions to the

3

joint venture. This firm determined that the fair market value of the Ainstein intellectual property to be contributed was several million dollars.

18.     On February 25, 2021, Ainstein and ADAC entered into a nonbinding Memorandum of Understanding for the formation of the joint venture.

19.     On June 1, 2021, Ainstein and ADAC entered into a Limited Liability Company Agreement ("the LLC Agreement") to form a Delaware limited liability company called RADAC, LLC ("RADAC") to act as the joint venture entity.  RADAC's stated purpose was to pursue the "development and commercialization of radar sensor solutions to be used in all applications in the global light vehicle and global commercial vehicle markets (the '***Business***')." (*See* Exhibit A, LLC Agreement § 2.05(a)) (emphasis original).

20.     The Members of RADAC are Ainstein (with a 51% interest) and ADAC (with a 49% interest). Pursuant to the LLC Agreement, each Member was required to designate two individuals to serve on the Board. (Exhibit A, LLC Agreement § 7.02).

21.     The LLC Agreement incorporated by reference a Contribution Agreement that was signed contemporaneously with the LLC Agreement and outlined each Member's Contribution of intellectual property and/or capital to RADAC. (Exhibit A, LLC Agreement § 3.01).

22.     Ainstein's agreed-to contribution was its intellectual property, including radar design technology and expertise to support RADAC's product development. The contribution included all Ainstein intellectual property related to light and commercial vehicle applications using millimeter wave radar for vehicle access, advanced driver assistance systems, and other autonomous applications. The contribution included royalty-free use of two pending and approved patented inventions as well as trade secret information, proprietary designs, and other highly-confidential technical information in the form of (1) hardware design, design guidance and

methodology, schematics, printed circuit board layouts, radio frequency design and testing; (2) radar processing algorithms, written explanations of these algorithms and optimization methods; and (3) software development and source code (hereinafter, "Ainstein('s) IP").

23.     ADAC's agreed-to contribution was to provide market access to large automobile original equipment manufacturers, to provide capital as needed up to $5 million, and to develop business engagements.

24.     Pursuant to the Contribution Agreement and the LLC Agreement, Ainstein licensed the Ainstein IP to RADAC for its exclusive use in light and commercial vehicle applications for the duration of the LLC Agreement. Ainstein did not transfer ownership of the Ainstein IP to ADAC or RADAC.

25.     As part of the joint venture, Ainstein assigned certain existing employee-engineers to work on RADAC projects at discounted rates pursuant to an Employee Leasing Agreement with RADAC, and ADAC assigned certain employees to work on RADAC projects under a separate Employee Leasing Agreement. These leased employees of the joint venture partners were to collaborate on the development work undertaken by RADAC using the Ainstein IP, and they were to be paid (or their employer reimbursed, in the case of Ainstein employees) for their labor using the capital committed to RADAC by ADAC.

26.     In exchange for the members' mutual commitments to RADAC, they agreed in the LLC Agreement to forego any independent radar-related product development in the light vehicle and commercial vehicle industries outside of the joint venture, for as long as the joint venture existed and in some cases for twelve months thereafter:

**Section 10.02 Non-Competition; Non-Solicitation.**

(a)     Each Member hereby agrees that, for so long as it or its Permitted Transferee, directly or indirectly, owns a Membership Interest and for a period of twelve (12) months after such Member is no longer a Member of the Company

5

(whether as a result of the Transfer of a Membership Interest or dissolution of the Company) (the "Restricted Period"), such Member shall not (and it shall cause its Affiliates not to) (x) engage in the Business or (y) directly or indirectly through one or more of its Affiliates, own, manage, operate, control or participate in the ownership, management, operation or control of, any Competitor or any division or business segment of any Competitor; provided, however, that nothing in this Section 10.02(a) shall (i) prohibit ADAC from directly or indirectly engaging in the Business at any time after the termination, dissolution, liquidation and winding up of the Company, (ii) prohibit Ainstein from engaging in activities conducted by the Company in industry segments other than the global light vehicle and global commercial vehicle markets after the termination, dissolution, liquidation and winding up of the Company, or (iii) prohibit such Member or any of its Affiliates at any time from acquiring or owning, directly or indirectly:

(i)      up to five percent (5%) of the aggregate voting securities of any Competitor that is a publicly traded Person; or

(ii)      up to five percent (5%) of the aggregate voting securities of any Competitor that is not a publicly traded Person, so long as such interest is passive and neither such Member nor any of its Affiliates, directly or indirectly, designates a member of the board of directors (or similar body) of such Competitor or its Affiliates or otherwise has an active role in the governance of such Person.

For purposes of this Section 10.02(a), "**Competitor**" means any other Person engaged, directly or indirectly, in whole or in part, in the Business.

Exhibit A, LLC Agreement at p. 37 (emphasis original).

27.      The members also agreed maintain strict confidentiality over the proprietary and confidential information of RADAC and of the other member:

**Section 10.01 Confidentiality.**
(a) Each Member acknowledges that it may have access to and become acquainted with trade secrets, proprietary information and confidential information belonging to the Company and the other Member that are not generally known to the public, including information concerning business plans, financial statements and other information provided pursuant to this Agreement, operating practices and methods, expansion plans, strategic plans, marketing plans, contracts, customer lists or other business documents that the Company treats as confidential, in any format whatsoever (including oral, written, electronic or any other form or medium) (collectively, "Confidential Information"). In addition, each Member acknowledges that: (i) the Company has invested, and continue to invest, substantial time, expense and specialized knowledge in developing its Confidential Information; (ii) the Confidential Information provides the Company with a competitive advantage over others in the marketplace; and (iii) the Company would be irreparably harmed if the Confidential Information were disclosed to competitors or made available to the

public. Without limiting the applicability of any other agreement to which any Member is subject, no Member shall, directly or indirectly, disclose or use (other than in connection with the conduct of the Company's business or the monitoring of its investment in the Company) at any time, including use for personal, commercial or proprietary advantage or profit, either during its association with the Company or thereafter, any Confidential Information of which such Member is or becomes aware, provided, however, that nothing in this Section 10.01(a) shall prohibit (y) ADAC from using the Confidential Information solely in connection with the conduct of its business in the global light vehicle and global commercial vehicle market or (z) Ainstein from using the Confidential Information solely in connection with the conduct of its business in industry segments other than the global light vehicle and commercial vehicle market, in each case from and after the termination, dissolution, liquidation and winding up of the Company. Each Member in possession of Confidential Information shall take all appropriate steps to safeguard such information and to protect it against disclosure, misuse, espionage, loss and theft.

*Id.* at pp. 35-36.

28.    In addition, the Ainstein – RADAC license agreement provided that the licensing of the Ainstein IP to RADAC did not "grant to Licensee or any other Person any right, title or interest by implication or otherwise[,]"  Ainstein-RADAC Patent License Agreement dated as of June 1, 2021 ("License Agreement") § 2.03, and that the Ainstein IP would be maintained as confidential:

The Party receiving Confidential Information from the Discloser ("Recipient") shall not disclose or grant the use of any Confidential Information except on a need-to-know basis to its directors, officers, employees, agents, permitted sub-licensees and permitted assignees, bound by substantially equivalent non-disclosure obligations and to the extent such disclosure is reasonably necessary in connection with Recipient's activities as expressly authorized by this Agreement.

*Id.* Article III.

29.    Following the establishment of the joint venture and execution of the License Agreement, Ainstein uploaded the Ainstein IP onto a Google drive owned and managed by Ainstein (the "Google Drive"), and gave the RADAC team access to the drive for development purposes. This permitted the employees who were leased to RADAC to access the Ainstein IP for

purposes of RADAC's development efforts, subject to the confidentiality clauses of the LLC Agreement and License Agreement.

30.     In July of 2021, RADAC agreed to fund a subcontractor, D3, through RADAC's budget to assist with the development of certain radar-enabled Proximity Access technology set to be launched in 2023. Proximity Access allows a vehicle's systems to detect certain motions or gestures near the vehicle using radar and to execute certain commands, such as opening a trunk, in response to such motion.

31.     RADAC Board Members agreed that RADAC would incur the expense to pay D3 for its assistance with research and development of the radar-based Proximity Access technology. Specifically, RADAC's budget approved by the Board (including its ADAC appointees) on or about July 13, 2021 included a projected spend well into the hundreds of thousands of dollars by RADAC on the D3 contract for 2021 and 2022.

32.     Moreover, the LLC Agreement's Non-Compete clause set forth above prohibited ADAC from pursuing such radar-enabled product development for vehicle applications outside of the Joint Venture.  Thus, there is no question that D3's radar related research and development, including any Proximity Access developments, belonged to RADAC and not ADAC.

### The Business Relationship Sours

33.     During RADAC's operation, ADAC employees bombarded Ainstein's engineers with intrusive and tertiary questions concerning Ainstein's IP.

34.     The inquiries ADAC employees posed were often not material to the RADAC development projects, and left Ainstein engineers uncomfortable with the level of detail sought.

35.     Tensions continued to rise when ADAC employees began treating Ainstein employees like hourly contract workers, rather than joint venture and majority owner partners.

36.     In an effort to quell rising concerns, Dr. Wang contacted Jack Prince, RADAC's then General Manager and a long-time ADAC employee. On September 12, 2022, Dr. Wang emailed Prince to attempt to involve leadership in creating a better work culture for RADAC as a whole, stating "[t]o make RADAC successful and attractive for talent[], I feel establishing the right culture, way of communication and even leadership style are more important. Some of the following pages are what I have been trying to do for our organization. I hope we could agree on these as general guidance. . . . Overall, it is an organizational maturity process for RADAC as a relatively young organization. I do agree the right culture needs more effort from the leadership team."

37.     ADAC's poor treatment of Ainstein employees, however, continued.

38.     This treatment led to a lack of trust between Ainstein engineers and ADAC employees, and to a demoralized workforce. On September 14, 2022, one Ainstein engineer stated "I'm fighting to force myself to work every day because this is such an issue. If he [ADAC's Advanced Engineering Manager and RADAC's Director of Engineering, Keith Scheiern] wants to own everything, let him. It's an absolute waste of my time and energy to try and plan the work if he's just going to do everything his way anyway."

39.     Raising similar concerns, on September 14, 2022, Michael Paulson, Ainstein's Director of Engineering, emailed Scheiern about a unilateral decision Scheiern had made for the joint venture, informing him that "others will perceive this was handled poorly because it happened without foreknowledge or agreement by Ainstein – solidifying in some people's minds that ADAC feels Ainstein works for them, not that we work together as partners. I have agreed to do what I can to head this off, but in the future, I need to be a part of that discussion to avoid collateral damage."

CORE/3502457.0004/181160073.3

40.     After a top Ainstein engineer's resignation and concerned about losing more talent due to ADAC's increasingly poor treatment, on September 29, 2022, Cheng Gao, Vice President of Operations at Ainstein, emailed Prince and Scheiern, stating "I am reaching out to make sure as partners, we are aligned on the common goal of this collaboration. Ainstein and ADAC both contributed to this JV with our own expertise, and it is not one working FOR the other. I believe we all agreed no team member should make any comments in a condescending manner. Ainstein has been working diligently toward a successful joint venture partnership, [and] the technical progress speaks for itself. We could not afford to lose engineers, and would not tolerate any negative comments toward our team."

41.     Unfortunately, ADAC did not treat Dr. Wang any better, notwithstanding his position as RADAC's Technical Director and a member of RADAC's Board of Managers.

42.     For example, on November 3, 2022, ADAC unilaterally fired Jack Prince from his position at ADAC and took the position that this ended his tenure as the RADAC General Manager. Neither Dr. Wang nor any other Ainstein representative was consulted about ADAC's decision to fire Prince, and therefore Ainstein did not vote to approve his termination as RADAC's General Manager. ADAC's unilateral action and attempt to remove Prince from his position as RADAC General Manager left RADAC in an uncertain and rudderless position as both Ainstein and Mr. Prince attempted to discern their rights and responsibilities following Prince's surprise termination from his long-time employer.  ADAC's action was a material breach of both the LLC Agreement and ADAC's duty of good faith and fair dealing thereunder.

43.     Specifically, Section 7.11 of the LLC Agreement provides that "any Officer may be removed **by the Board** with or without cause at any time." (emphasis added). However, any action by the RADAC Board is only permitted with the affirmative vote of a majority of the

Managers at any meeting of the Board at which a quorum is present. Further, any authorized action by the Board must include the affirmative vote of at least one of the Managers appointed by each Member—this would include an Ainstein Member.

44.    Section 7.06 provides in in relevant part as follows:

**Section 7.06 Quorum; Manner of Acting.**

(a) The presence of at **least three (3) Managers shall constitute a quorum**.

\* \* \*


(c) Each Manager shall have one (1) vote on all matters submitted to the Board. Except as otherwise set forth in this Agreement, the affirmative vote of a majority of the Managers in attendance at any meeting of the Board or any Committee at which a quorum is present shall be required to authorize any action by the Board or Committee and shall constitute the action of the Board or Committee for all purposes ***provided, however*, that such vote must include the affirmative vote of at least one of the Managers appointed by each Member.** (emphasis added).

Ex. A at pp. 23-24.

45.    Not only was an Ainstein Member not a part of the discussion or decision to try to terminate RADAC's General Manager, Jack Prince, Ainstein did not even hear about ADAC's action until *after* the fact.

46.    To add insult to injury, when Dr. Wang contacted ADAC Manager Jeff Ackerman on the same day that Prince was terminated, Ackerman said that he would get back to Dr. Wang in a few days to have a phone call about the firing, "[g]ive me a couple of days and yes we should have a convo [sic]." But Ackerman did not call Dr. Wang.

47.    Given ADAC's failure to even discuss with Ainstein the implications of Prince's termination for the joint venture, on November 8, Wang directed the Ainstein engineers to suspend their RADAC related development work, and removed ADAC's ability to access the Google Drive containing Ainstein's IP.

48.    In the weeks that followed, Wang and Ackerman had intermittent conversations in which both parties expressed an interest in continuing RADAC's development work on their own. ADAC advocated for a prompt dissolution of RADAC, which would free ADAC from its non-compete and allow it to pursue on its own the developments that RADAC had made so much progress on.

49.    In response to ADAC's expressed preference to dissolve the joint venture, Wang requested that ADAC make a proposal on the compensation to be paid to buy out Ainstein's portion of the jointly developed IP and its commercial prospects.  ADAC never responded to this request.

50.    ADAC terminated one of its appointees to the RADAC Board of Managers, Jeff Dolbee, in or about August, 2022. A replacement was not proposed by ADAC until January 20, 2023, when ADAC appointed Chris Teets as Dolbee's successor.

51.    Upon Teets's appointment in January, 2023, Ackerman agreed with Dr. Wang to schedule a Board meeting to discuss the dissolution of RADAC and several past due Ainstein invoices for employee time spent on RADAC activities.

52.    The Board meeting was agreed to occur over two days.   On February 8, 2023, Ackerman and Teets attended the first day of the Board meeting, at which Ainstein again requested compensation for the early dissolution of the joint venture and for payment of outstanding leased employee and expense invoices, and ADAC asserted ownership of the D3 work (a position with which Ainstein disagreed).  Following this meeting, Ackerman and Teets refused to cooperate in scheduling the second day of the Board meeting that they had previously committed to attend.

**ADAC's Theft and Breach of the Non-Compete Agreement is Revealed**

53.    Unbeknownst to Ainstein at the time, close to the time that ADAC unilaterally fired Prince, it also decided to misappropriate Ainstein's IP.

CORE/3502457.0004/181160073.3

54.     Specifically, on October 31, 2022 and on November 8, 2022, an ADAC employee with the email domain name aadamczyk@automotive.com downloaded 52,587 files containing Ainstein's IP from the Google Drive. On information and belief, this email domain name is that of Anne Adamczyk, a Senior Electrical Engineer with ADAC.

55.     On October 31, 2022, another ADAC employee with the email domain name cjohnson@adacautomotive.com downloaded 4 files containing Ainstein's IP from the Google Drive. On information and belief, this email domain name is that of Craig Johnson, a Project Manager at ADAC.

56.     On November 4, 2022, a third ADAC employee with the email domain name twells@adacautomotive.com downloaded 26,876 files containing Ainstein's IP from the Google Drive. On information and belief, this email domain name is that of Trent Wells, a Lead Electrical Engineer at ADAC.

57.     Prior to October 31, 2022, ADAC employees had never downloaded Ainstein's IP—valued at several million dollars—from the Google Drive, and they had no RADAC-related reason to do so in late October and early November, 2022. This brazen misappropriation of the Ainstein IP was a marked deviation from ADAC employees' previous cloud-based use of the material through the Google Drive.

58.     At or around the same time as these unprecedented downloads, ADAC terminated Prince, 'went dark' on communication with Ainstein, and failed to address the problems these actions created for RADAC.

59.     Further, in later communications, ADAC claimed that the development work of D3, which had been approved as a RADAC expense, belonged to ADAC rather than RADAC. Ainstein's collaboration on the D3 work on behalf of the joint venture included Ainstein personnel

checking and interpreting D3's work at ADAC's request in June 2022, and Ainstein personnel attending a two-day technical session for the specific purpose of evaluating D3's design work on behalf of RADAC in October 2022, again at ADAC's request.

60.     Upon information and belief, ADAC willfully misappropriated the Ainstein IP and RADAC's D3 and other development work for the purpose of shoring up ADAC's ability to develop radar technology for automotive applications in-house and without Ainstein's or RADAC's involvement.

61.     Upon information and belief, ADAC continues to breach the LLC Agreement by developing radar sensor solutions using the misappropriated work of RADAC and Ainstein in direct violation of the non-compete and confidentiality provisions of the LLC Agreement and the confidentiality provisions of the License Agreement.

62.     Upon information and belief, ADAC decided to proceed on its own for the oldest reason in the book: greed.

63.     In a proposed offering to a potential third investor in RADAC in July of 2022, ADAC and Ainstein valued RADAC in the tens of millions of dollars, and internal RADAC projections had predicted revenues in the hundreds of millions of dollars.

64.     This shows that the parties considered RADAC's future to be bright and that ADAC had no reason to abandon it, other than to appropriate RADAC's value to itself at the expense of its much smaller joint venture partner.  Once ADAC had stolen Ainstein's IP, terminated Prince without input from Ainstein, and used Ainstein's engineers for their valuable early research and development manpower, it attempted to cleave itself from Ainstein and RADAC entirely.

65.     At least one high-level ADAC manager, Keith Scheiern, had advanced the view to other ADAC managers as early as 15, 2022, that the joint venture approach was a mistake and only

ceded half the profits to be made from radar-related developments to Ainstein for no reason.  Jack Prince's notes of a meeting that day involving Ackerman, Prince and Scheiern reflect: "Keith believes that . . . ADAC alone[] could have hired the radar engineering talent or contracted D3 to develop and launch both Prox Access and SDOD [side door object detection]. He believes *we are giving away half the profits* without benefit from the Einstein [sic] team . . . . It is clear by [Scheiern's] behavior that he has zero faith in Ainstein's capabilities and **believes creating RADAC vs. managing everything as ADAC was a mistake**." (emphasis added).

66.     ADAC's subsequent actions reflect that it shared this view (except for Ainstein providing no benefit, given that ADAC took the Ainstein IP precisely because of its value) and decided to act on it.

67.     In August, 2022, Schiern (following internal discussions with the ADAC team) directed an Ainstein software engineer acting as RADAC's Side Door Object Detection Technical Lead "not to put focus towards growing RADAC as a company unless [Scheiern] allow[s] it."

68.     The timing of the major events that give rise to this lawsuit tell the story of ADAC's malfeasance.



69.     Further, in or about February, 2023, ADAC unilaterally suspended accessibility to RADAC's website with the domain name www.radac.com. No Ainstein appointee to the RADAC Board was consulted about the website's shutdown, which effectively cut off the joint venture's communication with potential automotive industry customers about the exciting technology RADAC had been developing.

15

70.     ADAC's continuing breach of the non-compete and confidentiality clauses of the LLC Agreement and its misappropriation and use (or threatened use) of the Ainstein IP and RADAC's D3 and other work are causing irreparable injury to Ainstein.

71.     This injury includes the head start that ADAC will have as it violates the non-compete, the injury to the value of Ainstein's IP and to RADAC's radar-related developments from their use and potential disclosure by a competitor, the injury to Ainstein's interest in RADAC's future prospects and profits, and the erosion of market share and goodwill that ADAC's use of the misappropriated materials and violation of the non-compete and confidentiality provisions have caused and will continue to cause to RADAC and Ainstein.  Each of these categories of damage, and particularly those accruing through a development stage entity like RADAC, is difficult and uncertain to calculate.

72.     For precisely such reasons, ADAC and Ainstein expressly agreed that a breach of the LLC Agreement would lead to irreparable injury, such that injunctive relief and specific performance would be available without the need to post bond:

> **Section 13.14 Equitable Remedies.** Each party hereto acknowledges that a breach or threatened breach by such party of any of its obligations under this Agreement would give rise to irreparable harm to the other parties, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by such party of any such obligations, each of the other parties hereto shall, in addition to any and all other rights and remedies that may be available to them in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

Exhibit A at pp. 46-47.

73.     The LLC Agreement permits Ainstein as a member of the RADAC joint venture to pursue claims for breach of the LLC Agreement and other joint venture agreements on behalf of RADAC individually and at the expense of RADAC:

CORE/3502457.0004/181160073.3

> **Section 7.15   Claims Under JV Agreements**. Notwithstanding anything herein to the contrary, in the event of a breach or alleged breach by a Member or its Affiliate of an obligation owed the Company under any JV Agreement, the other Member shall be entitled to assert a claim for and enforce, at the Company's reasonable expense, such obligation on behalf of the Company and may pursue on behalf of the Company all remedies available to it in respect of such breach. The Company shall cooperate and comply with any reasonable instructions received from the Member enforcing the rights of the Company in connection with any of the foregoing actions. The Member exercising any rights pursuant to this Section 7.15 agrees to promptly reimburse the Company for any expenses advanced by it to such Member or incurred by the Company in connection with such claim if it is not successful.

*Id*. at p. 27.

74.     In the alternative, Ainstein may bring its claims for harm to RADAC derivatively under Kansas and/or Delaware law, and demand is excused because for RADAC's Board to authorize commencement of any action against ADAC would require the approval of at least one of ADAC's Board appointees under § 7.06 of the LLC Agreement.  ADAC's appointees to the RADAC Board, Ackerman and Teets, have a clear conflict of interest in voting on whether to initiate legal action against ADAC, so demand is excused.

75.     The LLC Agreement has an arbitration clause at § 13.12, but § 13.14 set forth above provides an exception to bring suit in a court of competent jurisdiction for equitable relief such as the injunction Ainstein seeks here.  Further, the arbitration clause does not apply to tort claims such as the claim for misappropriation of trade secrets because that claim does not arise from or relate to the LLC Agreement.

CORE/3502457.0004/181160073.3

## COUNT I
## MISAPPROPRIATION OF TRADE SECRETS – KAN. STAT. ANN. §§ 60-3320 to 60-3330

76.     Ainstein incorporates by reference the allegations of Paragraphs 1 through 75 as if fully set forth herein.

77.     Ainstein owns the Ainstein IP consisting of trade secret information, proprietary designs, and other highly-confidential technical information in the form of (1) hardware design, design guidance and methodology, schematics, printed circuit board layouts, radio frequency design and testing; (2) radar processing algorithms, written explanations of these algorithms and optimization methods; and (3) software development and source code.

78.     The Ainstein IP has actual and potential independent economic value from not being generally known or readily ascertainable by proper means to other persons who can obtain economic value from its disclosure. In late 2020, ADAC's valuation contractor estimated the value of the Ainstein IP to be several million dollars.

79.     The Ainstein IP has been subject to reasonable efforts to maintain its secrecy, including the NDA executed in 2019, the confidentiality and non-compete clauses in the LLC Agreement, password-protected access provided only to those under an obligation of confidentiality to Ainstein, and otherwise not permitting others to obtain the information prior to execution of non-disclosure agreements.

80.     Ainstein also requires all of its employees to sign Non-Disclosure Agreements ("Employee NDAs") in which employees agree to "hold in confidence all [nonpublic] information disclosed concerning the business activities of Ainstein."  The Employee NDAs further require that, "Except as required in the conduct of the Employer's business or as expressly authorized in writing on behalf of the Employer, … Employee shall not use or disclose, directly or indirectly,

CORE/3502457.0004/181160073.3

any Confidential Information or Trade Secrets to any unauthorized third parties."  The Employee

NDA states that this obligation survives termination of employment.

81.    Confidential Information is defined in the Employee NDA to mean:

[A]ny and all information that is possessed by or developed for the Employer, relates to the Employer's existing or potential business or technology, is generally not known to the public, and which information the Employer seeks to protect from disclosure to its existing or potential competitors or others, and includes, without limitation, for example: business plans, business strategies, business know-how and techniques, marketing plans, product information, product processes, proprietary computer codes, all intellectual properties, and the identities and business preferences of current, past, or prospective customers or vendors.

82.    Trade Secrets are defined in the Employee NDA to mean:

[A]ll information possessed by or developed for the Employer, including, without limitation, a compilation, program, device, method, system, technique, formula, pattern, or process to which all of the following apply: (i) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use and (ii) the information is the subject of efforts to maintain its secrecy that are reasonable under the circumstances.

83.    Additionally, Ainstein's Employee Handbook contains a confidentiality policy that mirrors the language of the Employee NDA set forth above.  The Employee Handbook also states that computers provided by Ainstein are company property and must be treated as such, and returned upon demand.

84.    The Ainstein IP is not otherwise publically available and is the culmination of years of proprietary research and development efforts.

85.    Pursuant to the LLC Agreement, the Contribution Agreement and a license agreement, Ainstein agreed to license the Ainstein IP only to RADAC, and neither permitted its transfer by download, nor its use by ADAC independent of RADAC's business.

86.     ADAC's surreptitious download in late October and early November, 2002 of thousands of files constituting the Ainstein IP was not authorized by Ainstein and violates Kan. Stat. Ann. §§ 60-3320 to 60-3330.

87.     ADAC knew or should have known that downloading the Ainstein IP from the Google Drive was an improper means of acquiring the trade secret and confidential information. In the LLC Agreement, ADAC agreed to limit its use of the information to uses for RADAC business purposes, and to maintain the secrecy of the information..

88.     ADAC's knowledge of impropriety is further revealed by the fact that before ADAC decided to part ways with RADAC and Ainstein, no ADAC employees had downloaded any of the Ainstein IP. The misappropriation only occurred during a narrow window of time, from October 31 through November 8, 2022, just around the time ADAC unilaterally and without notice terminated RADAC General Manager Jack Prince.

89.     Kan. Stat. Ann. § 60-3321(a) authorizes the Court to enjoin "actual or threatened misappropriation" of a trade secret.

90.     Defendant ADAC should be enjoined from further misappropriating, using or disseminating the Ainstein IP pursuant to Kan. Stat. Ann. § 60-3321(a) and should be required to remove and wipe the Ainstein IP from its systems after forensically imaging any ADAC-controlled computer device or storage medium on which it has been stored or used for purposes of discovery in this matter.

91.      Given ADAC's clear misappropriation of Ainstein's IP, Ainstein has a substantial likelihood of success on the merits.

92.     In the absence of an injunction, Ainstein will be irreparably harmed because ADAC's continued use of Ainstein's trade secrets threatens the loss of trade secret status and

harms Ainstein's goodwill, future profits, competitive interests and market share for radar-related applications in the global light vehicle and global commercial vehicle markets. Because each of these harms is difficult to measure and fully quantify, Ainstein lacks an adequate remedy at law.

93.     The threatened harm to Ainstein's place in the competitive market, its relationship to current and future clients, and the injury to its business outweighs the potential injury that an injunction may impose to ADAC.

94.     An injunction here will serve the public interest because without such trade secret protections, companies would have little incentive to innovate as the cost and effort of such innovation would fall solely on the innovator, while the fruits of the effort would be available to unscrupulous competitors. Protecting trade secrets by injunction, therefore, fosters innovation and serves the public interest.

95.     ADAC's actions are willful and malicious, and warrant the imposition of an injunction, actual damages, disgorgement of any unjust enrichment, exemplary damages and an award of Ainstein's reasonable attorney fees pursuant to Kan. Stat. Ann. §§ 60-3321 through 60-3323.

96.     WHEREFORE, Ainstein respectfully requests that the Court enter judgment in its favor, and against ADAC, as follows:

a.     Entering judgment in Ainstein's favor and against ADAC on Count I;

b.     Ordering preliminary and permanent injunctive relief enjoining ADAC, its officers, agents, servants, employees, attorneys, successors, and assigns and those persons in active concert or participation with them from continuing to use Ainstein's IP, which include trade secrets and other proprietary information;

c.      Ordering ADAC to return or destroy all Ainstein IP in its possession that it obtained through improper means, after first forensically imaging any computer devices or storage media on which it was stored or used for purposes of discovery in this matter;

d.      An Order permanently enjoining ADAC from engaging in any activity that misappropriates Ainstein's IP, which includes trade secrets and other proprietary information, or other similar acts;

e.      An Order awarding Ainstein's damages, ADAC's gain and/or a reasonable royalty, the costs of the action, and any other damages available pursuant to the applicable laws, common laws, and/or Kansas Law, in an amount exceeding $75,000;

f.      Awarding Ainstein's interest, including prejudgment and post-judgment interest, on the foregoing sums;

g.      An award of Ainstein's attorneys' fees and costs; and

h.      An award of such other relief as the Court may deem just and equitable under the circumstances.

## COUNT II
## MISAPPROPRIATION OF TRADE SECRETS- DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836 et seq.

97.      Ainstein incorporates by reference the allegations of Paragraphs 1 through 96 as if fully set forth herein.

98.      The Ainstein trade secrets are related to products used in or intended for use in interstate commerce.

99.      ADAC's actions constitute misappropriation of trade secrets under 18 U.S.C. § 1839(5).

CORE/3502457.0004/181160073.3

100.     Ainstein   is   entitled   to   injunctive   relief   preventing   actual   or   threatened misappropriation and requiring ADAC to return the trade secrets under 18 U.S.C. § 1836(b)(3)(A), as well as damages under 18 U.S.C. § 1836(b)(3)(B).

101.     WHEREFORE, Ainstein respectfully requests that the Court enter judgment in its favor, and against ADAC, as follows:

a.       Entering judgment in Ainstein's favor and against ADAC on Count I;

b.       Ordering preliminary and permanent injunctive relief enjoining ADAC, its officers, agents, servants, employees, attorneys, successors, and assigns and those persons in active concert or participation with them from continuing to use Ainstein's IP, which include trade secrets and other proprietary information;

c.       Ordering ADAC to return or destroy all Ainstein IP in its possession that it obtained through improper means, after first forensically imaging any computer devices or storage media on which it was stored or used for purposes of discovery in this matter;

d.       An Order permanently enjoining ADAC from engaging in any activity that misappropriates Ainstein's IP, which includes trade secrets and other proprietary information, or other similar acts;

e.       An Order awarding Ainstein's damages, ADAC's gain and/or a reasonable royalty, the costs of the action, and any other damages and relief available pursuant to the Defend Trade Secrets Act;

f.       Awarding Ainstein's interest, including prejudgment and post-judgment interest, on the foregoing sums;

g.       An award of such other relief as the Court may deem just and equitable under the circumstances.

CORE/3502457.0004/181160073.3

## COUNT III
## <u>UNFAIR COMPETITION</u>

102.    Ainstein incorporates by reference the allegations of Paragraphs 1 through 101 as if fully set forth herein.

103.    To the extent that any of the Ainstein IP is determined not to qualify as trade secrets, that information is nonetheless confidential business and technical information that ADAC was under an obligation to protect and not use for its own benefit.

104.    ADAC's misappropriation and use or threatened use of the Ainstein IP consisting of confidential information not rising to the level of trade secrets constitutes unfair competition under Kansas law.

105.    ADAC's unfair competition has caused and will continue to cause damage and irreparable harm to Ainstein.

106.    Ainstein is entitled to injunctive relief and damages as a result of ADAC's unfair competition.

107.    WHEREFORE, Ainstein respectfully requests that the Court enter judgment in its favor, and against ADAC, as follows:

a.      Entering judgment in Ainstein's favor and against ADAC on Count I;

b.      Ordering preliminary and permanent injunctive relief enjoining ADAC, its officers, agents, servants, employees, attorneys, successors, and assigns and those persons in active concert or participation with them from continuing to use Ainstein's IP, which include trade secrets and other proprietary information;

c.      Ordering ADAC to return or destroy all Ainstein IP in its possession that it obtained through improper means, after first forensically imaging any computer devices or storage media on which it was stored or used for purposes of discovery in this matter;

d.      An Order permanently enjoining ADAC from engaging in any activity that misappropriates Ainstein's IP, which includes trade secrets and other proprietary information, or other similar acts;

e.      An Order awarding Ainstein's damages, ADAC's gain and/or a reasonable royalty, the costs of the action, and any other damages available pursuant to the applicable laws, common laws, and/or Kansas Law, in an amount exceeding $75,000;

f.      Awarding Ainstein's interest, including prejudgment and post-judgment interest, on the foregoing sums;

g.      An award of Ainstein's attorneys' fees and costs; and

h.      An award of such other relief as the Court may deem just and equitable under the circumstances.

## COUNT IV
## BREACH OF NON-COMPETE AND CONFIDENTIALITY OBLIGATIONS UNDER LLC AGREEMENT AND BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING (INDIVIDUALLY OR IN THE ALTERNATIVE DERIVATIVELY ON BEHALF OF RADAC)

108.    Ainstein incorporates by reference the allegations of Paragraphs 1 through 107 as if fully set forth herein.

109.    Section 10.02 of the LLC Agreement is a non-competition and non-solicitation provision that prohibits any Member of the joint venture from directly or indirectly engaging in the Business, including through one or more of its affiliates or those under its operation or control, during the LLC's existence and in some cases for a period of 12 months after dissolution.

110.    The LLC Agreement defines the Business as "the development and commercialization of radar sensor solutions to be used in all applications in the global light vehicle and global commercial vehicle markets . . . and all activities necessary or incidental thereto." (Exhibit A, LLC Agreement § 2.05(a)).

CORE/3502457.0004/181160073.3

111.    ADAC's misappropriation of RADAC's D3 and other work product, its continued use of that work product to develop radar-related technology for use in global light vehicle and commercial vehicle markets, and its use of the Ainstein IP to develop and/or commercialize radar-related technology for use in the global light vehicle and commercial vehicle markets all violate the non-competition clause given that RADAC is still an existing entity and has not terminated, liquidated, dissolved and wound up.

112.    In Section 10.01 of the LLC Agreement, ADAC agreed to maintain the confidentiality of the confidential, proprietary and/or trade secret information of both Ainstein and RADAC for at least as long as RADAC continues to exist.

113.    ADAC's misappropriation and use of RADAC and Ainstein information as set forth above also breaches this confidentiality provision of the LLC Agreement, given that RADAC is still an existing entity and has not terminated, liquidated, dissolved and wound up.

114.    ADAC's breaches of the LLC agreement are causing irreparable harm to Ainstein and RADAC in the form of loss of the use of trade secrets and confidential and proprietary information which ADAC may be integrating into products that it intends to market; potential loss of trade secret, proprietary and confidential status of the misappropriated information; loss of profits from Ainstein's or RADAC's commercialization of the trade secret, confidential and/or proprietary information in automotive applications; damage to reputation; and erosion of market goodwill.

115.    Defendant ADAC should be enjoined for the actual and continued violation of the non-compete, non-solicitation and confidentiality provisions in the LLC Agreement.

116.    Given ADAC's clear violation of the enforceable non-compete and confidentiality provisions by its continued business and research and development efforts with D3 and

misappropriation of the Ainstein IP, Ainstein has a substantial likelihood of success on the merits of its action.

117.    The threatened harm to Ainstein's and RADAC's place in the competitive market, their relationship to their current and future clients, and the injury to their businesses outweigh the potential injury that an injunction may cause to ADAC.

118.    An injunction will serve the public interest because the public has an interest in enforcing valid agreements and protecting innovators from the misuse of their trade secret, confidential and proprietary information. Preventing joint venturers from appropriating the developments of the venture for their own sole benefit in violation of valid and binding agreements fosters innovation and certainty in business arrangements and serves the public interest.

119.    ADAC's unilateral action in terminating key management of RADAC including Jack Prince and taking the position that Prince is no longer RADAC's General Manager, in disabling the public-facing website of RADAC, in misappropriating RADAC and Ainstein confidential information, and in usurping RADAC developments and business opportunities, constitute a breach of the duty of good faith and fair dealing underlying the joint venture agreements, including the LLC Agreement.

120.    Ainstein and RADAC are suffering, and will continue to suffer, damage and irreparable harm due to ADAC's wrongful conduct. ADAC's actions are intentional and willful and warrant the imposition of an injunction, actual damages, and/or the award of ADAC's profits to Ainstein and/or RADAC.

121.    Section 7.15 of the LLC Agreement gives Ainstein the right to bring claims to enforce obligations owed to RADAC under the LLC Agreement and other joint venture agreements (including ADAC's Contribution Agreement) at RADAC's reasonable expense.

122.   The ADAC contribution Agreement requires ADAC to contribute up to $5 million to RADAC to pursue its business.   On information and belief, to date ADAC has contributed approximately $2 million of this commitment to RADAC.

123.   Accordingly, ADAC should be ordered to fund RADAC with sufficient capital up to its remaining capital commitment in order to permit RADAC to meet its obligation to pay the cost of enforcing the obligations ADAC owes to RADAC through this claim, including Ainstein's reasonable attorney's fees and costs to pursue this claim and the salary of Jack Prince as RADAC's General Manager, since he continues to serve in that position.

124.   In the alternative to Ainstein bringing some or all of this claim individually under Section 7.15 of the LLC Agreement, Ainstein asserts this claim derivatively on behalf of RADAC.

125.   Ainstein has been a member of RADAC continuously from RADAC's inception to the present, and demand on the Board of Managers is excused for the reasons explained above.

126.   WHEREFORE, Ainstein respectfully requests that the Court enter judgment in its favor, and against ADAC, as follows:

a.      Entering judgment against ADAC on Count IV;

b.      Ordering preliminary and permanent injunctive relief prohibiting ADAC, its officers, agents, servants, employees, attorneys, successors, and assigns and those persons in active concert or participation with them from continued breach of its non-compete and confidentiality obligations under the LLC Agreement, and from continuing to breach its duty of good faith and fair dealing;

c.      An Order requiring specific performance of ADAC's capital contribution commitment up to a total of $5 million, in order to enable RADAC to pay its General Manager and pay the fees and costs of pursuing this claim; and

d.      An award of such other relief as the Court may deem just and equitable under the circumstances.

## DEMAND FOR JURY TRIAL

Ainstein demands a trial by jury on all issues so triable.


## DESIGNATION OF PLACE OF TRIAL

Pursuant to D. Kan. Local Rule 40.2(a), Plaintiff designates Kansas City, Kansas as the place of trial for this matter.

29

**VERIFICATION**

I, Zongbo Wang, declare that I am the Founder and President of Ainstein AI, Inc. and have authorized the filing of this Complaint. Pursuant to those duties, I have personal knowledge of or have reviewed business records informing me of the events discussed in the foregoing Complaint. I have reviewed the Complaint and know or believe that all allegations of which I have personal knowledge of are true. I further believe the allegations of which I do not have personal knowledge to be true based on specified information, business records, or both. I declare under penalty of perjury and pursuant to 28 U.S. Code § 1746 that the foregoing is true and correct.

_____     Dated:\_\_\_April-18-2023_____
Zongbo Wang

CORE/3502457.0004/181160073.3

Dated:  April 18, 2023

Respectfully submitted,

*/s/ Sean W. Colligan*
Sean W. Colligan, Kan. Bar # 25727
Renee E. Henson, Kan. Bar # 28493
STINSON LLP
1201 Walnut Street, Suite 2900
Kansas City, MO 64106-2150
Tel: (816) 691-3384
sean.colligan@stinson.com
renee.henson@stinson.com

31